UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Averil C. Morrison, Delisa Williams, Janenne Gonzalez, Delroy Danvers, Garfield Danvers, Individually and on behalf of all others similarly situated, | 12  CV 301(FB)(RER) |
| **Plaintiffs,** | **First Amended Complaint and Jury Demand** |
| - against - | |
| International Union of Operating Engineers Local 14-14B, AFL-CIO, Bay Crane Service Inc., DCM Erectors, Inc., Dragados Construction USA, Inc., Dragados USA, Inc., El Sol Contracting and Construction Corporation, Forest City Commercial Construction Co., Inc.,  Forest City Ratner Companies, LLC, Gotham Construction Company, LLC, Halmar Construction Corp., Judlau Contracting, Inc., Judlau Enterprises, LLC,  Lend Lease (US) Construction LMB Inc., Monadnock Construction, Inc., Shiavone Construction Co. LLC, Skanska USA Inc., Skanska Inc., Solera Construction Inc., Sorbara Construction Corp., Tishman Construction Corporation of Manhattan, Tishman Construction Corporation of New York, Tishman Construction Corporation, Turner Construction Company, Yonkers Contracting Company, Inc. | |
| **Defendants.** | |

Plaintiffs, by their attorney, Michael G. O'Neill, complain against defendants as follows:

## JURISDICTION AND VENUE

1.      This is an action to remedy race discrimination in the construction industry in New York City.

2.      Jurisdiction is by virtue of 28 U.S.C. §1331, 28 USC §1343, 28 U.S.C. §1367,

42 USC §1981 and 42 USC §2000e et seq.

3.      Venue is proper because Local 14s are residents of the Eastern District of New York.

## THE PARTIES

4.      Plaintiff Averil C. Morrison ("Morrison") is an African American woman.

5.      Plaintiff Delisa Williams ("Williams") is an African American woman.

6.      Plaintiff Janenne Gonzalez ("Gonzalez") is an Hispanic woman.

7.      Plaintiff Delroy Danvers ("Delroy) is an African American man.

8.      Plaintiff Garfield Danvers ("Garfield") is an African American man.

9.      Defendant International Union of Operating Engineers Local 14-14B, AFL-CIO ("Local 14") is a Labor Organization within the meaning of 42 USC §2000e(d).

10.     Local 14 is the collective bargaining representative of individuals who operate various types of heavy equipment in the construction industry within New York City, including Cranes, Hoists, Excavators and related categories of equipment.

11.     The individuals represented by Local 14 are known in the industry as "Operating Engineers."

12.     Although there is no licensing of Operating Engineers per se, some of the equipment operated by Operating Engineers does require a license or permit to operate by the New York City Department of Buildings or some other city agency.

13.     Bay Crane Service Inc. is a New York Corporation with its principal place of business in Queens, New York.

14.     DCM Erectors, Inc. is a New York Corporation with its principal place of

business in New York City.

15.     Dragados Construction USA, Inc. is a foreign corporation with its principal place of business in New York City.

16.     Dragados USA, Inc. is a foreign corporation with its principal place of business in New York City.

17.     El Sol Contracting and Construction Corporation is a New York Corporation with its principal place of business in Queens, New York.

18.     Forest City Commercial Construction Co., Inc. is a foreign corporation with its principal place of business in New York City.

19.     Forest City Enterprises, Inc. is a foreign corporation with its principal place of business in Cleveland, Ohio.

20.     Forest City Ratner Companies, LLC is a New York Limited Liability Corporation with its principal place of business in New York City.

21.     Gotham Construction Company, LLC is a New York Limited Liability Corporation with its principal place of business in New York City.

22.     Halmar Construction Corp. is a New York Corporation with its principal place of business in Pearl River, New York.

23.     Judlau Contracting, Inc. is a New York Corporation with its principal place of business in Queens, New York.

24.     Judlau Enterprises, LLC is a New York Limited Liability Corporation with its principal place of business in Queens, New York.

25.      Lend Lease (US) Construction LMB Inc. is a New York Corporation with

its principal place of business in New York City.

26.     Monadnock Construction, Inc. is a New York Corporation with its principal place of business in Bronx, New York.

27.     Schiavone Construction Co. LLC is a foreign Limited Liability Corporation with its principal place of business in New Jersey.

28.     Skanska USA Inc. is a New York Corporation with its principal place of business in Queens, New York.

29.     Skanska Inc. is a foreign corporation with its principal place of business in Queens, New York.

30.     Solera Construction Inc. is a New York Corporation with its principal place of business in New Rochelle, New York.

31.     Sorbara Construction Corp. is a New York Corporation with its principal place of business in Lynbrook, New York.

32.     Tishman Construction Corporation of Manhattan is a foreign corporation with its principal place of business in New York City.

33.     Tishman Construction Corporation of New York is a foreign corporation with its principal place of business in New York City.

34.     Tishman Construction Corporation is a foreign corporation with its principal place of business in New York City.

35.     Turner Construction Company is a New York Corporation with its principal place of business in New York City.

36.     Yonkers Contracting Company, Inc. is a New York Corporation with its

principal place of business in Yonkers, New York.

37.     All of the corporate defendants (sometimes referred to herein collectively as the "contractor defendants" or the "defendant contractors") are engaged in the construction industry in New York City.

## CLASS ALLEGATIONS

38.     Plaintiffs brings this action on behalf of themselves and a class of individuals (the "Class") consisting of all non-White members of Local 14-14B who have worked or attempted to work in the construction industry in New York City within the statute of limitations periods applicable to the claims made herein.

39.     The number of persons in the Class identified above are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, plaintiffs estimate that the number of the persons in the Rule 23 Class is at least 100.

40.     The claims of plaintiffs are typical of the claims of the Class.

41.     Plaintiffs will fairly and adequately protect the interests of the Class.

42.     The actions of defendants complained of herein have been on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

43.     There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members of the Class, including but not limited to:

(a)     whether Local 14 has intentionally and systematically discriminated

against non-White members in the assignment of work to operating engineers;

(b)      whether Local 14 has intentionally and systematically discriminated in favor of White members in the assignment of work to operating engineers;

(c)      whether Local 14's system of assigning work to operating engineers has disparately impacted non-White members;

(d)      whether the defendant contractors have intentionally discriminated against non-White operating engineers;

(e)      whether the defendant contractors hiring practices with respect to operating engineers has disparately impacted non-White operating engineers;

(f)      the nature and extent of Class-wide injury and the appropriate measure of damages for the Class.

44.      The claims of the plaintiffs are typical of the claims of the Class they seek to represent.  Plaintiffs and the Class are all non-White operating engineers and members of the Local 14 labor union.  Plaintiffs and the Class are all affected by the employment practices of the defendants complained of herein, which affect the quality and quantity of work that plaintiffs and the Class are able to obtain in the construction industry in New York City, which in turn affects the compensation that plaintiffs and the Class are able to earn.  Plaintiffs and the Class are identically, or substantially identically, affected by these practices.

45.      Defendants have committed the acts complained of herein on grounds generally applicable to the Class, thereby making declaratory relief with respect to the Class appropriate.

46.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

47.     Plaintiffs have retained counsel competent and experienced in labor and employment litigation, including class actions.

48.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Class have been damaged and are entitled to recovery as a result of Local 14's common and uniform policies, practices, and procedures and the common practices and procedures of the defendant contractors.  The acts complained of herein apply identically to all members of the Class, and therefore class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about defendants' practices.  Plaintiffs have been informed and believe that many members of the Class fear retaliation if they bring actions in their own names or otherwise challenge the practices complained of herein, and a class action will permit them to participate in recovery without fear of the same.

## FACTS

49.     There is a long history of discrimination against non-Whites in the construction industry.

50.     Despite previous attempts at eradicating the effects of past discriminatory practices (see, e.g., *Equal Employment Opportunity Comm'n v. Local 14, Int'l Union of Operating Engineers*, 553 F.2d 251 (2d Cir. 1977)), Local 14 remains virtually an all White union.

51.     Local 14 has about 1,200 members.

52.     Upon information and belief, about 100 of Local 14's members are non-White.

53.     Upon information and belief, about 20 of Local 14's members are both female and non-White.

54.     Local 14 is governed by an Executive Board, and day to day operations are performed by Officers.

55.     Although the constitution and by-laws of Local 14 require the Executive Board and Officers to be elected by Local 14's members, there has not been an election since 2002.

56.     Local 14 has entered into collective bargaining agreements with industry trade groups.  These agreements set forth terms and conditions by which members of the trade groups employ Operating Engineers.

57.     The wages provided for by these collective bargaining agreements (collectively, the "CBA") are very high.  Base hourly rates range from $35 on the low end up to over $60 on the high end, depending on the type of equipment operated.  Night, weekends, holidays and overtime hours are paid at double time.  The value of benefits paid for these jobs is about 50 percent of the base wage rate.

58.     The CBA require covered employers to hire Operating Engineers who belong to Local 14 to operate any of the equipment specified by the CBA.

59.     Covered employers may hire Operating Engineers directly, as long as the Operating Engineers are members of Local 14..

60.     Covered employers may also hire Operating Engineers through Local 14's hiring hall.

61.     Not all jobs for Operating Engineers in the construction industry are created equal.  Sometimes, an Operating Engineer will be required for only one day or for a short period of time.

62.     On the other hand, major construction projects may provide steady employment for Operating Engineers for years.

63.     Large construction projects also require that so-called "Master Mechanics" be hired.  A Master Mechanic is an Operating Engineer who is charged with ensuring that the provisions of the CBA are complied with at a job site and acting as an on-site liaison between the contractor and the Local 14.

64.     In theory, the Master Mechanic is also qualified to operate and troubleshoot all equipment covered by the CBA and to fill in on a temporary basis should there be an unexpected need for an Operating Engineer.

65.     The Master Mechanic is generally the highest earning Operating Engineer at the worksite.  He (almost never, she) can work virtually as much double time as he desires.  At a large worksite, the Master Mechanic can easily earn several hundred thousand dollars a year.

66.     The Master Mechanic also wields a large amount of power at the worksite.  The Master Mechanic determines how strictly the CBA work rules are enforced.  A Master Mechanic who "cooperates" with the contractor by being "reasonable" with respect to the enforcement of the CBA work rules can save the

contractor many hundreds of thousands of dollars a year in labor costs.

67.     The CBA gives Local 14s the right to designate the Master Mechanic to be employed by the contractor at the work site.

68.     During all times complained of herein, Local 14 has systematically operated its affairs in such a manner as to ensure that the highest paying and longest lasting jobs for Operating Engineers in the construction industry are reserved for Whites and to ensure that non-Whites as a class are under-represented in the industry and are relegated to the lower paying jobs and jobs of shorter duration.

69.     Local 14 accomplishes the foregoing through a variety of acts and practices.

70.     Local 14 intentionally limits the membership of non-Whites by informing individuals who inquire over the phone about membership that "the books are closed," meaning that Local 14 is purportedly not accepting new members.  Local 14, however, routinely accepts new members who are referred or sponsored by existing White members.

71.     The few non-White members that are admitted into Local 14's membership almost always must go through a long and tedious apprenticeship program. During this program, which often lasts years for non-Whites, apprentices earn a fraction of the wages of Operating Engineers.  Even after serving as apprentices, non-Whites are sometimes denied admission to membership in Local 14.

72.     For the most part, Whites who are referred or sponsored by existing White members do not have to go through the apprenticeship program.  Such individuals are

often permitted to work jobs covered by the CBA without any delay and without having any qualifications other than being sponsored by an existing White member.

73.     It is by controlling and manipulating the procedures for hiring and assigning Operating Engineers, however, that Local 14 has perfected the means for ensuring that White Operating Engineers enjoy the best jobs and earn the most money.

74.     In general, the very best paying job for Operating Engineers is Master Mechanic.

75.     There is no objective qualification, test or experience requirement to be a Master Mechanic.

76.     The Local 14 has the sole and unfettered discretion to decide which Operating Engineers are assigned to be the Master Mechanic at a work site.  The only limit on Local 14's discretion is that the contractor may approve the Local 14's appointment.  In practice, the Local 14's appointment is never challenged by the contractor.

77.     Local 14 almost never appoints non-Whites as Master Mechanics.

78.     Control over the appointment of Master Mechanics gives Local 14 control over the hiring process for all large construction projects, which is where the longest lasting and best paying jobs are.

79.     This control is effectuated by the ability of the Master Mechanic to insist on strict compliance with the work rules and terms and conditions of the CBA.

80.     Thus, for example, if the contractor were to insist on hiring Operating Engineers of its own choosing, which it theoretically can do under the CBA, the Master

Mechanic, which is beholden to the Local 14, can insist on a strict interpretation of the rules and the CBA in terms of manning and operating machines, etc.  This can greatly increase the cost of construction.

81.    As a practical matter, therefore, contractors obtain Operating Engineers through the Local 14.

82.    Nominally, this is to be done through Local 14's hiring hall.

83.    In theory, the hiring hall operates on a first come, first served basis.  The first Operating Engineer to show up at the hall receives the first assignment for work for which he is qualified.

84.    Under this system, in theory, getting work is a function of getting to the hiring hall early, and getting good work is the luck of the draw.

85.    In reality, however, it is not so much the luck of the draw as it is the luck of the Irish, except that it is not luck and it is not only the Irish, but the Italians, the Germans, and just about anybody except for non-Whites.

86.    The hiring hall system is entirely rigged.

87.    The premium jobs, that is to say, the jobs on long term construction projects, do not appear suddenly or randomly.

88.    A large construction project involves a lot of planning.  The contractor knows weeks, sometimes months, in advance when actual construction will start and when Operating Engineers will be needed at the worksite.

89.    Furthermore, the contractor knows with some certainty how long the construction project will last.

90.     In order to request Operating Engineers from Local 14, the contractor calls the business agent assigned to the region where the construction project is taking place.

91.     The contractor informs the business agent what machines will need Operating Engineers, when the work will start, and how long the work will last.

92.     Local 14 is in this fashion alerted to the availability of premier jobs at major construction projects well in advance of when the actual jobs start.

93.     The business agent will then plan which Operating Engineers are to be assigned to these projects.

94.     There are at least three ways that the business agent can ensure that a particular Operating Engineer is assigned to a particular job.

95.     The first and most blunt approach is simply to instruct the contractor to request the Operating Engineer by name.  This creates a record that makes it appear that the contractor was exercising its right under the CBA to hire an Operating Engineer directly.

96.     Second, the business agent can hold the job request until the chosen Operating Engineer is the next engineer to be assigned at the hiring hall.

97.     Third, the business agent can actually sign in the Operating Engineer at the hiring hall to make it appear that he arrived at a particular time, which fortuitously enables the Operating Engineer to be assigned to the job as it comes up.

98.     Every construction job comes to an end eventually.  In theory, this would mean that every Operating Engineer becomes unemployed at one time or another.

99.     There are tricks and techniques used by Local 14 to ensure that White

Operating Engineers have the most continuity of employment.

100.    For example, a three year job may have five or six months left of work.  At that time, a new project comes online that is planned to last at least two years.  The Operating Engineer at the job that is winding down will be told to quit that job, and shortly thereafter (if not immediately) he will be assigned to the new project, thus ensuring uninterrupted employment for two more years.

101.    Non-White Operating Engineers are discriminated against is by Local 14's practice of allowing individuals to work jobs covered by the CBA "on permit."  "On permit" means that the individual working the job is not a member of Local 14 but is being permitted to work a job covered by the CBA in order to gain the necessary experience to join Local 14.  Since only Local 14's members are supposed to work jobs covered by the CBA, any unemployed Operating Engineer has the right to take the job of an individual who is working on permit.

102.    In 2010, plaintiff had been out of work for a while.  Plaintiff requested Local 14 to enforce its rules, but it refused to remove White individuals working on permit or without the proper license in order to permit plaintiff to have a job.

103.    Up to the present time, there are numerous White individuals working on permit at long term construction sites, such as the World Trade Center site, earning well over $100,000 a year, while plaintiff and members of plaintiff's class struggle to find any employment at all.

104.    These jobs are supposed to be filled only by Local 14's members, but Local 14 permits White individuals, who are not full members, to remain employed to the

detriment of non-White Operating Engineers.

105.     As women, Morrison, Williams and Gonzalez suffer additional

discrimination in the industry. Historically, there have been very few female Operating

Engineers.  Women are generally not assigned jobs operating the heavier equipment that

pays higher wages.

106.     Morrison, Williams and Gonzalez, like most female Operating Engineers,

have been assigned mostly the small machines such as compressors and welding

machines.  The wages for operating these machines is lower than the wages for operating

the heavier equipment.

107.     There are no female Master Mechanics.

108.     There are no women on the Executive Board.

109.     There are no women on the Examining Board.

110.     White women who are the daughters of White Operating Engineers,

however, are often given favored treatment.  There are some jobs for Operating Engineers

that are relatively clean and easy, and these are usually assigned to the daughters of

White Operating Engineers.

111.     Under the CBA a contractor must employ an Operating Engineer to

operate a building's elevator, when a certain amount of space is being renovated.  An

example of such a project is the renovation of the Federal Courthouse at 40 Center Street

in Manhattan.  Operating Engineers are employed at that project to run the elevators in

the building, even though these are the same self-service freight or passenger elevators

that any adult can operate.  These jobs are called house elevators, and they are often

given to the daughters of White Operating Engineers because they are clean, easy, require no training and often pay very well. Upon information and belief, two of the three Operating Engineers assigned to the house elevators at the Federal Courthouse are White women.

112. Another area where Local 14 discriminates in favor of Whites is in the assignment of "settlements." The CBA requires contractors engaged in the renovation of interior space over a certain threshold of square footage to hire Operating Engineers. Ostensibly this is to operate the elevators within the building, but frequently the service of the Operating Engineer is just not required. In such a case, the contractor pays a "settlement," meaning that an Operating Engineer is paid for a certain number of weeks, and there is no requirement that the Operating Engineer ever show up. It is, in essence, a "no show" job.

113. Upon information and belief, settlements are rarely if ever assigned to non-White Operating Engineers.

114. An Operating Engineer who receives a settlement can work at another site and collect two paychecks. This practice is not permitted under Local 14's by-laws, but upon information and belief Local 14 makes no attempt to enforce this rule against White Operating Engineers.

115. Local 14 also discriminates in favor of Whites by permitting retired Operating Engineers to come out of retirement from time to time to accept lucrative work assignments, typically as Master Mechanics.

116. This preferential treatment is not afforded to non-Whites.

117.    The foregoing constitutes a pattern and practice of racial discrimination in favor of Whites and against non-White Operating Engineers and entitles plaintiff and the class she seeks to represent the relief requested herein.

118.    Upon information and belief, as a result of the foregoing pattern and practice of discrimination, White Operating Engineers as a class earn substantially more money than non-White Operating Engineers.

119.    Plaintiff timely filed charges of race discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

120.    On about October 31, 2011, plaintiff received a "right to sue" letter from the EEOC.

121.    The contractor defendants employ operating engineers at construction projects in New York City.

122.    The contractor defendants are signatories to collective bargaining agreements with Local 14 which require them to hire members of Local 14 to operate equipment within Local 14's jurisdiction in New York City.

123.    The contractor defendants are sophisticated business entities and rank among the largest construction companies in New York City, if not nationwide.

124.    By virtue of the size, expertise and sophistication, the contractor defendants are engaged as contractors or sub-contractors on large construction projects in New York City.

125.    These large projects provide the most desirable construction jobs in New York City, because they are long in duration and often require substantial amounts of

overtime.

126.     Operating engineers employed in large construction projects often earn well over one hundred thousands dollars a year, exclusive of fringe benefits.

127.     For many of these jobs, there is no educational or licensing requirement.

128.     Because the contractor defendants are signatories to Local 14 collective bargaining agreements, the only requirements for many jobs requiring operating engineers is that they be members of Local 14.

129.     As sophisticated business entities and large employers, the contractor defendants are aware of the general demographics of New York City and the surrounding metropolitan area.

130.     According to publicly published census records, New York City is approximately 44 percent White, while the metropolitan record is approximately 61 percent White (including Hispanic Whites.)

131.     Given the high wages and low education and experience requirements for operating engineers, the fact that the membership of Local 14 is approximately 90 percent White strongly suggests that Local 14 has systematically discriminated against non-Whites in granting admission to Local 14.

132.     The contractor defendants all know that discrimination on the basis of race, ethnicity or gender is illegal under Federal, State and Local laws.

133.     The contractor defendants all know that they are obligated to implement, maintain and administer hiring practices that provide equal opportunity to all individuals with regard to race, ethnicity or gender.

134.   The obligation to implement, maintain and administer non-discriminatory hiring practices is a non-delegable duty of the contractor defendants.

135.   Notwithstanding their non-delegable obligations to implement, maintain and administer non-discriminatory hiring practices, the contractor defendants have intentionally or recklessly adopted hiring practices for operating engineers that discriminate against plaintiffs and the Class.

136.   The discriminatory practices of the contractor defendants include, but are not necessarily limited to, the following.

137.   First, despite the fact that the relevant collective bargaining agreements give contractors the absolute right to hire operating engineers of their own choosing, to a greater or lessor extent contractor defendants delegate their hiring authority to Local 14.

138.   In other words, under this hiring practice, the contractor defendants permit Local 14 to decide what operating engineers will be hired for major construction projects.

139.   Since the obligation to comply with Federal, State and Local discrimination laws is non delegable, the contractor defendants are liable for the acts of intentional discrimination committed by Local 14 when the contractor has permitted Local 14 to decide what operating engineers will be hired for major construction projects.

140.   Second, when contractor defendants exercise their own hiring authority with respect to operating engineers, they rely on low level supervisors or site managers to make the hiring decisions.

141.   This is essentially a word of mouth hiring practice.

142.    Because of past discrimination in the industry, close family and other ties between low level supervisors and site managers on the one hand and Local 14 and White operating engineers on the other, and the discriminatory intent of low level supervisors and site managers, this word of mouth hiring practice is virtually guaranteed to result in discrimination against non Whites in the hiring of operating engineers for major construction projects.

143.    Finally, the contractor defendants have failed to take minimum steps to promote equal opportunity and non-discriminatory hiring practices with respect to operating engineers.

144.    For example, the contractor defendants do not advertise or publicize the availability to employment opportunities for operating engineers for major construction projects.

145.    The contractor defendants do not establish a hiring process (e.g., applications and interviews) using human resource professionals in order to minimize the chance of bias and discrimination affecting the hiring of operating engineers.

146.    The contractor defendants assert no pressure on Local 14 to eliminate discrimination in its membership admission process.

147.    The relevant collective bargaining agreements with Local 14 are negotiated by contractor trade groups, such as the Contractors' Association of Greater New York.

148.    These trade groups, of which many of the contractor defendants are prominent members, have enormous bargaining power with respect to Local 14.

149.    Despite this bargaining power, the contractor defendants have done

nothing to require Local 14 to make available to the contractor defendants operating engineers that reflect the diverse work force of New York City.

150.    At the same time, the contractor defendant contractually obligate themselves to hire members of Local 14, thereby ensuring that a disproportionate number of operating engineers will be male and White.

151.    Some of the contractor defendants have demonstrated their antipathy toward equal opportunity for minorities by engaging in fraudulent practices that deprive women and minorities of employment opportunities.

152.    Under these practices, certain contractor defendants have defrauded the federal government by falsely certifying payroll and other records relating to minority or disadvantaged business enterprises.

153.    For example, in 2012 Lend Lease agreed to pay a $50 million fine to settle charges of disadvantaged business enterprise fraud.

154.    Also in 2012, the Dragados and Judlau contractor defendants agreed to pay a $7.5 million fine to settle charges of disadvantaged business enterprise fraud.

155.    In 2011, the Skanska contractor defendants agreed to pay a $19.6 million fine to settle charges of disadvantaged business enterprise fraud.

156.    In 2010, Schiavone agreed to pay a $20 million fine to settle charges of disadvantaged business enterprise fraud.

157.    Upon information and belief, the foregoing fraudulent practices have deprived plaintiffs and the Class they seek to represent of employment opportunities in New York City.

158.    The simple fact is that discrimination against the Class could not exist without the active consent and participation of contractors, including the contractor defendants.

## First Claim

159.    Local 14 has engaged in a pattern and practice of discrimination against non-Whites, or discrimination in favor of Whites, in violation of 42 U.S.C. §2000e et seq.

160.    By virtue of the foregoing, plaintiffs and the class that plaintiffs seek to represent have suffered damages.

## Second Claim

161.    Local 14 has engaged in a pattern and practice of discrimination against non-Whites, or discrimination in favor of Whites, in violation of 42 U.S.C. §1981 et seq.

162.    By virtue of the foregoing, plaintiffs and the class that plaintiffs seek to represent have suffered damages.

## Third Claim

163.    Local 14 has engaged in a pattern and practice of discrimination against non-Whites, or discrimination in favor of Whites, in violation of the New York City Human Rights Law.

164.    By virtue of the foregoing, plaintiff and the class that plaintiffs seek to represent have suffered damages.

### Fourth Claim

165.     Local 14 has engaged in a pattern and practice of discrimination against women in violation of 42 U.S.C. §2000e et seq.

166.     By virtue of the foregoing, plaintiffs Morrison, Gonzalez and Williams have suffered damages.

### Fifth Claim

167.     Local 14 has engaged in a pattern and practice of discrimination against women in violation of the New York City Human Rights Law.

168.     By virtue of the foregoing, plaintiffs Morrison, Gonzalez and Williams have suffered damages.

### Sixth Claim

169.     The contractor defendants have violated 42 U.S.C. §1981 by intentionally discriminating against non-Whites or in favor of Whites in the hiring and employment of operating engineers.

170.     Additionally and alternatively, the contractor defendants have violated 42 U.S.C. §1981 by engaging in business practices, including hiring practices, that have had a negative, disparate impact upon non-Whites or a positive, disparate impact upon Whites.

171.     By virtue of the foregoing, plaintiffs and the class that plaintiffs seek to represent have suffered damages.

## *Seventh Claim*

172.   The contractor defendants have violated the New York City Human Rights Law by intentionally discriminating against non-Whites or in favor of Whites in the hiring and employment of operating engineers.

173.   Additionally and alternatively, the contractor defendants have violated the New York City Human Rights Law by engaging in business practices, including hiring practices, that have had a negative, disparate impact upon non-Whites or a positive, disparate impact upon Whites.

174.   By virtue of the foregoing, plaintiffs and the class that plaintiffs seek to represent have suffered damages.

## *Eighth Claim*

175.   The contractor defendants have violated the New York City Human Rights Law by intentionally discriminating against women or in favor of men in the hiring and employment of operating engineers.

176.   Additionally and alternatively, the contractor defendants have violated the New York City Human Rights Law by engaging in business practices, including hiring practices, that have had a negative, disparate impact upon women or a positive, disparate impact upon men.

177.   By virtue of the foregoing, plaintiffs Morrison, Gonzalez and Williams have suffered damages.

**WHEREFORE**, plaintiffs demands judgment for all relief permitted by law, including but not limited to:

a       Awarding plaintiff and the members of the class that plaintiff seeks to represent a money judgment for their damages, including but not limited to lost wages, lost benefits, front pay, other economic damages, shame, humiliation, embarrassment and mental distress;

b       Awarding plaintiff and the members of the class that plaintiff seeks to represent punitive damages;

c       Awarding to plaintiff and the class that plaintiff seeks to represent attorneys' fees;

d       Awarding pre-verdict, post-verdict and prejudgment interest and costs;

e       Granting preliminary and permanent injunctive relief enjoining Local 14 from engaging in the discriminatory practices complained of herein;

f       Granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York
   July 6, 2012

MICHAEL G. O'NEILL
(MO3957)

_____
Attorneys for Plaintiffs
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-099

# Jury Demand

Plaintiffs demand trial by jury on all issues.

Dated: New York, New York
      July 6, 2012

                       MICHAEL G. O'NEILL
                       (MO3957)

                       _____
                       Attorneys for Plaintiff
                       30 Vesey Street, Third Floor
                       New York, New York 10007
                       (212) 581-0990